*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2016).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0859**

Chrystal Gardner,
Relator,

vs.

Community Action Duluth,
Respondent,

Department of Employment and Economic Development,
Respondent.

**Filed February 13, 2017
Affirmed
Halbrooks, Judge**

Department of Employment and Economic Development
File No. 34360321-3

Alicia L. Anderson, Edina, Minnesota (for relator)

William L. Davidson, Lind, Jensen, Sullivan & Peterson, Minneapolis, Minnesota (for respondent Community Action Duluth)

Lee B. Nelson, Timothy C. Schepers, Keri A. Phillips, Minnesota Department of Employment and Economic Development, St. Paul, Minnesota (for respondent department)

Considered and decided by Kirk, Presiding Judge; Halbrooks, Judge; and Rodenberg, Judge.

UNPUBLISHED OPINION

**HALBROOKS**, Judge

Relator challenges an unemployment-law judge's (ULJ) determination that she is ineligible for unemployment benefits because she was discharged for employment misconduct. Relator argues that (1) respondent employer's choice for relator's new supervisor was unreasonable and (2) a reasonable employee would have refused to accept this individual as her supervisor. We affirm.

**FACTS**

Relator Chrystal Gardner worked as a financial and career coach for respondent Community Action Duluth (CAD) from December 2014 to January 2016. CAD maintains a fragrance-free workplace policy that prohibits employees from wearing scented products. Gardner used scented oils on her hair. In October 2015, Gardner received two reminders of CAD's policy but continued to use scented oils on her hair. Gardner requested an accommodation from the policy, but because she did not specify her desired accommodation, management did not provide one. Around this time, Karen St. George, a fellow financial coach and Gardner's coworker, complained to Gardner about a "strong stench" coming from Gardner's hair. While Gardner, an African-American, complained about St. George's comment to a manager at a cultural inclusion meeting, she did not report the incident to the executive director, Angela Miller, or other management personnel.

On January 7, 2016, one of CAD's directors, Sarah Priest, informed Gardner that, due to a restructuring plan, Gardner was being assigned to a new program at CAD. Priest also told Gardner that St. George would become her new supervisor and directed her to

meet with St. George. Gardner complained about St. George's assignment as her supervisor and submitted an employee workplace-conflict complaint form. The complaint alleged that management was creating a hostile work environment that made Gardner fear for her safety. Gardner also requested a private meeting with management, and she filed a discrimination complaint with the EEOC against CAD.

Gardner failed to attend her new program's team meeting on January 19, 2016. St. George notified Gardner that she had not responded to the meeting's e-mail invitation and that she was expected to attend the team meetings, including the next meeting on January 26. Gardner did not contact St. George or respond to her e-mail. Miller scheduled a meeting with Gardner and requested that she be prepared to discuss specific concerns or incidents regarding St. George or other members of the management team. But during the meeting, Gardner failed to provide any specific details regarding her complaints. At the meeting and in a subsequent e-mail, Miller informed Gardner that St. George would remain her supervisor and that she was expected to meet with St. George by January 27. Miller also directed Gardner to attend the January 26 team meeting and to reply promptly and professionally to staff e-mails regarding CAD matters. Miller advised Gardner that her continued noncompliance with these expectations could lead to discipline, including discharge.

Gardner did not attend the January 26 team meeting and did not respond to the meeting's invitation. The next day, St. George contacted Gardner regarding her failure to attend the January 26 meeting, advised Gardner that she was available most of the day to meet, and requested that Gardner contact her to set up a time to meet. Gardner chose not

3

to contact St. George and did not meet with her. On January 28, CAD discharged Gardner from employment due to insubordination and unprofessional conduct in failing to accept CAD's decision to assign her a new supervisor.

Gardner applied for unemployment benefits, but respondent Minnesota Department of Employment and Economic Development (DEED) determined that she is ineligible for benefits because she was fired for insubordination, which is a form of employment misconduct. Gardner appealed this decision to a ULJ. The ULJ conducted an evidentiary hearing at which several witnesses, including Gardner, testified. Finding that employees have a duty to comply with their employer's reasonable directions and that Gardner intentionally failed to comply with CAD's reasonable request to meet with St. George, the ULJ determined that Gardner is not eligible for benefits. The ULJ also found that, although St. George made a comment about Gardner's hair odors, there was insufficient evidence to determine that the comment was racially motivated or discriminatory in nature. Gardner requested reconsideration of the ULJ's decision, and the ULJ affirmed. This certiorari appeal follows.

**D E C I S I O N**

**I.**

Gardner argues that the ULJ erred in deciding that she committed employment misconduct. This court may reverse, remand, or modify a ULJ's decision if a relator's substantial rights have been prejudiced because the findings, conclusions, or decision are affected by an error of law or lack the support of substantial evidence in the record. Minn. Stat. § 268.105, subd. 7(d) (2016).

4

**A.     Employment Misconduct and Insubordination**

We must first decide whether Gardner engaged in employment misconduct, which presents a mixed question of fact and law. *Schmidgall v. FilmTec Corp.*, 644 N.W.2d 801, 804 (Minn. 2002). If the ULJ's factual findings are supported by substantial evidence, we will defer to the ULJ on factual issues. *Ywswf v. Teleplan Wireless Servs., Inc.*, 726 N.W.2d 525, 529 (Minn. App. 2007). But whether an employee's particular actions amount to employment misconduct is a question of law, which we review de novo. *Schmidgall*, 644 N.W.2d at 804.

An employee who is discharged for employment misconduct is ineligible for unemployment benefits. Minn. Stat. § 268.095, subd. 4(1) (2016). Employment misconduct is statutorily defined as "intentional, negligent, or indifferent conduct, on the job or off that job that displays clearly: (1) a serious violation of the standards of behavior the employer has the right to reasonably expect of the employee; or (2) a substantial lack of concern for the employment." *Id.*, subd. 6(a) (2016).

Minnesota courts have consistently held that an employee's refusal to follow an employer's reasonable requests constitutes employment misconduct. *See, e.g.*, *Schmidgall*, 644 N.W.2d at 804. When an employee knowingly violates an employer's instructions and directives, such action amounts to employment misconduct because it is a willful disregard of the employer's interests. *Id.* at 806. "This is particularly true when there are multiple violations of the same rule involving warnings or progressive discipline." *Id.* at 806-07. Insubordination may also be considered disqualifying misconduct. *Deike v. Gopher Smelting*, 413 N.W.2d 590, 592 (Minn. App. 1987). For instance, this court affirmed a

denial of unemployment benefits when an employer discharged an employee for refusing to meet or cooperate with her supervisor. *Snodgrass v. Oxford Props., Inc.*, 354 N.W.2d 79, 79-80 (Minn. App. 1984). In *Snodgrass*, the employee stated that she would not talk with her supervisor or take orders from him because he was harassing her. *Id.* at 80. But because she was unable to provide support for her harassment claim, we held that her failure to cooperate indicated a deliberate disregard of her employer's reasonable expectations. *Id.*

Here, the ULJ properly found that CAD's request that Gardner meet with St. George and attend the new program's team meetings was reasonable. It is within CAD's interests to have its employees attend required meetings and to communicate effectively with their supervisors, especially under these circumstances, when CAD was implementing a new program as part of a restructuring plan. Due to her discontent with CAD's assignment of St. George as her new supervisor, Gardner chose not to participate in any of the team meetings and did not attempt to communicate with St. George. Despite numerous reminders and requests from management to attend the team meetings and meet personally with St. George, Gardner continued to miss meetings and ignore St. George's attempts to communicate.

Gardner argues that CAD's expectation that she accept St. George as her supervisor was not reasonable because she had made several complaints to CAD alleging that St. George created a hostile work environment. She claims that despite her complaints, CAD did not provide feedback for her complaints and unreasonably insisted that she communicate with St. George. Gardner's argument relies in part on the fact that CAD did

not conduct a formal investigation of her hostile work-environment complaints and that her complaints were intertwined with the allegations of misconduct. *See Vargas v. Nw. Area Found.*, 673 N.W.2d 200, 205-06 (Minn. App. 2004) (rejecting the employee's retaliation claim by stating that a formal investigation was conducted separate from the process of addressing the employee's job performance), *review denied* (Minn. Mar. 30, 2004).

But similar to the circumstances in *Snodgrass*, Gardner failed to provide any specific incidents or details that could substantiate or explain her allegations of experiencing "an environment of hostility, bias, cultural overtone, public humiliation, intimidation, neglect and harassment."[1] Many of her concerns appear aimed at CAD's management team generally and do not focus on St. George. CAD accommodated Gardner's request for a private meeting to discuss her concerns and the decision to make St. George her supervisor. But while at the meeting and despite being asked by management, Gardner did not provide any specific complaints or incidents regarding St. George or any other manager. Because Gardner did not explain her concerns with specificity and because she continued to disregard management's directions, her actions provided CAD with a sufficient basis to discharge her for insubordination and unprofessional conduct. We therefore conclude that Gardner's actions amounted to

---

[1] The ULJ did find that St. George made a comment regarding the smell of Gardner's hair in October 2015. But there is no indication that the comment was racially motivated. And the ULJ determined that Gardner did not raise her complaint regarding the comment to CAD's management personnel. Indeed, details of this specific incident did not appear in any of Gardner's complaints to management.

continuous violations of CAD's reasonable expectations and demonstrated an intentional disregard of CAD's interests. The ULJ's decision to determine that Gardner is ineligible for unemployment benefits was warranted.

## B.    Average-Reasonable-Employee Exception

Gardner claims that her refusal to accept St. George as her new supervisor did not constitute employment misconduct because any reasonable employee would have responded in the same manner. It is not employment misconduct for an employee to engage in "conduct an average reasonable employee would have engaged in under the circumstances." Minn. Stat. § 268.095, subd. 6(b)(4) (2016). But Gardner provides insufficient evidence that her conduct, particularly refusing to attend team meetings and communicate with her new supervisor, is the conduct that an average, reasonable employee would have engaged in under her circumstances.[2] While Gardner expressed dissatisfaction with having St. George as her new supervisor, the ULJ found that the evidence was insufficient that a reasonable person would have construed St. George's comments to Gardner about her hair as racial discrimination.[3] Gardner was also well aware that management planned to keep St. George in the supervisory position, that she was to meet

---

[2] Gardner's reliance on testimony from Rogier Gregoire, a human rights commissioner from Duluth, is misplaced. Gregoire testified broadly that he thought CAD's management performance was questionable but then referred to an incident unrelated to Gardner or St. George. Although he thought that it was "debatable" that CAD would put St. George in a supervisory position when she had prior issues with Gardner, he specifically qualified his testimony, acknowledging that he had heard only one version of the facts.

[3] The ULJ determined that a reasonable explanation for the comment was that St. George found the scented oils inappropriate for the workplace and in violation of CAD's fragrance policy.

with St. George, and that she was to communicate professionally and promptly with all of CAD's staff. In addition, Miller informed Gardner after the meeting that noncompliance with these directions may "result in discipline up to and including possible termination." CAD's requests did not impose an unreasonable burden on Gardner. *See Vargas,* 673 N.W.2d at 206 (stating that if an employer's request does not impose an unreasonable burden on an employee, the employee's refusal to abide by the request is misconduct). Nonetheless, Gardner did not attend the January 26 team meeting and when St. George notified Gardner of her availability on January 27 to meet, Gardner chose not to contact or meet with her. Under these circumstance, we conclude that Gardner's conduct does not satisfy the average-reasonable-employee exception to employment misconduct.

**II.**

Gardner also implies that the ULJ did not conduct the hearing fairly, asserting that the ULJ's tone during the hearing and in the decision made it apparent that the ULJ did not find Gardner's refusal of St. George as her supervisor to be reasonable. She also contends that she made several attempts at the hearing to explain how the workplace environment was hostile toward her but that the ULJ's interruptions hindered her ability to develop her testimony. The ULJ is required to "assist all parties in the presentation of evidence" and "ensure that all relevant facts are clearly and fully developed." Minn. R. 3310.2921 (2015).

The record in this case provides no indication that the ULJ was partial to one party over the other. The hearing lasted approximately eight hours over the course of two days. The ULJ gave clear instructions on how the hearing was going to proceed and told both parties that they would be given an opportunity to provide testimony and then summarize

9

their testimony in a closing argument.  During Gardner's testimony, the ULJ repeatedly asked her for specific reasons why she had issues with St. George as her supervisor and whether she informed management with details about these concerns.  It is clear that the ULJ attempted to assist Gardner in presenting her evidence in a manner that avoided broad statements and generalities.  The ULJ also allowed Gardner to explain her testimony by asking open-ended questions, such as, "Anything else you want to add?"  While the ULJ decided that Gardner's testimony was less credible than the testimony of CAD's witnesses, this does not suggest unfairness.  Rather, this court gives deference to the ULJ on credibility determinations.  *Skarhus v. Davanni's Inc.*, 721 N.W.2d 340, 344 (Minn. App. 2006) (stating that the ULJ's factual findings are viewed in the light most favorable to the decision which includes giving deference to the ULJ's credibility determinations).

The record demonstrates that the ULJ's findings are supported by substantial evidence and that the ULJ did not improperly favor one party.  Because Gardner showed a pattern of refusing to adhere to CAD's reasonable directives, we conclude that the ULJ did not err in determining that Gardner is not eligible for unemployment benefits on the basis of her discharge for employment misconduct.

**Affirmed.**